# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEON FRENKEL,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **KENNETH H. BAKER,** *et al.*, | : | |
| **Defendants.** | : | **No. 13-5880** |
| | : | |

## <u>MEMORANDUM</u>

**Schiller, J.**                                                                                    **November 4, 2014**

Leon Frenkel commenced this action to enforce two promissory notes, both of which he claims are in default, and an escrow agreement, which he claims was breached. Defendants Kenneth H. Baker, Baker Enterprises of Polk County, Inc., The Baker Group, New Life Church of Wauchula, Inc., Omar J. Fitzgerald, David B. Webster, Bruce K. Klein, Leo W. King, Four Kings, Inc., Vishnu Kumar, E-Title Services Agency, LLC, and Annette LaBrie were properly served with the Summons and First Amended Complaint ("FAC"). LaBrie filed a timely answer. Baker filed an answer shortly after the deadline. The Clerk of Court entered default against all properly served Defendants[1] except LaBrie, and Frenkel moved for a default judgment on certain counts as to all Defendants except LaBrie. For the reasons provided below, the Court denies Frenkel's motion as to Baker, denies Frenkel's motion and dismisses Frenkel's claims as to Klein and New Life Church on Counts I, II, VIII, and IX, and grants Frenkel's motion as to all other counts and Defendants for which he has requested default.

---

[1] In addition to those Defendants listed above, the FAC names an additional Defendant, Fitzgerald Enterprises, which it describes as "a defunct Nevada business entity." (FAC ¶ 15.) Fitzgerald Enterprises was never served with the Summons and FAC. This opinion therefore does not include Fitzgerald Enterprises in referring to "all Defendants."

# I.     BACKGROUND

## A.     Factual Allegations

On March 28, 2014, Frenkel filed the FAC, asserting twenty counts in connection with allegations of two distinct RICO schemes, which he refers to as the "SBLC Scheme" and the "Sugar Contract Scheme." The actual RICO claims are not at issue in this motion for default judgment.

The SBLC Scheme involves a promissory note (the "SBLC Note") on which Frenkel alleges he is owed payment after the borrowers defaulted, as well as an allegedly breached escrow agreement for the same funds. Frenkel identifies the SBLC Note borrowers as Baker and Baker Enterprises. (FAC ¶ 41.) The alleged purpose of the SBLC Note was to demonstrate proof of funds by depositing $250,000 in escrow for seventy-two hours, in order for Baker Enterprises to access an alleged Stand-By Letter of Credit ("SBLC") from HSBC Bank for $2 billion. (*Id.* ¶¶ 39, 48.) The SBLC was to be used by Baker, Baker Enterprises, Baker Group, and New Life Church. (*Id.* ¶ 31.) The SBLC would, in turn, allow access to an allegedly lucrative "Sugar Contract." (*Id.* ¶ 38.)   He asserts that Baker is the alter ego of Baker Enterprises, a Florida incorporated business entity with its principal place of business at Baker's home address. (*Id.* ¶¶ 10-11.) Frenkel also asserts that Baker is the alter ego of Baker Group which, like Baker Enterprises, is a Florida business entity with its principal place of business at Baker's home address. (*Id.* ¶ 12.) Frenkel further asserts that Baker is the alter ego of New Life Church, which is a Florida non-profit business with an address in Wauchula, Florida. (*Id.* ¶ 13.) Frenkel also claims that Klein introduced him to Baker for the fraudulent purposes of the SBLC Scheme, which Frenkel identifies as disbursing money and other benefits to Baker and the other Defendants in the Scheme. (*Id.* ¶ 32.)

The FAC asserts that Baker and Baker Enterprises, jointly and severally as borrowers, executed the SBLC Note in favor of Frenkel for $250,000, with a maturity date of June 28, 2013. (*Id.* ¶ 41.) The SBLC Note allegedly reflects $250,000 that Frenkel deposited in escrow with Webster at Fitzgerald and Baker's request. (*Id.* ¶¶ 40-42, 45.) Frenkel refers to this deposit as the "Frenkel Funds." (*Id.* ¶¶ 40, 42.) Frenkel asserts that Baker introduced him to James Fitzgerald, also known as Omar Fitzgerald, who in turn introduced him to Webster as an escrow agent. (*Id.* ¶¶ 45, 50.)  Frenkel alleges that he repeatedly demanded that Baker and Baker Enterprises repay the SBLC Note, but they failed to do so. (*Id.* ¶ 44.)

Frenkel asserts that an additional document, the Escrow Agreement, memorializes the same Frenkel Funds deposit of $250,000 that Frenkel made with Webster. (*Id.* ¶¶ 52-56.) Frenkel, Baker Enterprises, and Webster all executed the Escrow Agreement, which is attached to the FAC. (*Id.* ¶ 52.) That agreement calls for Frenkel to provide proof of funds by depositing the Frenkel Funds into escrow with Webster for three banking days. (*Id.* ¶ 53.) After three days, the agreement requires Webster to return all of the funds to Frenkel.[2] (*Id.* ¶ 54.) Frenkel deposited the funds on March 18, 2013, the same day the parties executed the Escrow Agreement. (*Id.* ¶¶ 52, 56.) Webster should have returned the funds to Frenkel on March 21, 2013, pursuant to the Escrow Agreement, but he failed to do so. (*Id.* ¶¶ 57-59.) Moreover, Webster, Fitzgerald, and Baker repeatedly assured Frenkel over telephone calls and emails that the Frenkel Funds would be returned to him, but they never were. (*Id.* ¶¶ 58-60, 63-68, 70-71.) The FAC asserts that those assurances were made knowingly and falsely and that none of the Defendants ever had any intention of returning the Frenkel Funds to Frenkel. (*Id.* ¶¶ 64, 69-70.) Frenkel attaches to the FAC emails and references to phone calls that he alleges contain

---

[2] The FAC does not explain why the parties allegedly created both the SBLC Note and the Escrow Agreement to pledge the return of the same funds on different days, by different parties.

knowingly false statements and fraudulent documents in connection with the SBLC Scheme from Baker and Webster. (*Id.* Exs. L, P, Q.)

Frenkel claims that, rather than returning the Frenkel Funds, Webster disbursed it on March 18, 2013, in varying amounts, to E-Title and LaBrie via cashier's checks that referenced Fitzgerald in the memo line, and spent a portion of it on a new car for LaBrie and Fitzgerald, also purchased with a cashier's check referencing Fitzgerald. (*Id.* ¶ 62.) Copies of the checks are attached to the FAC. (*Id.* Exs. M, N, O.) Frenkel asserts that LaBrie is Fitzgerald's estranged wife. (*Id.* ¶ 62.) Frenkel asserts that E-Title is a Michigan limited liability company with Kumar as its sole member, and that E-Title is the alter ego of Kumar. (*Id.* ¶ 21.)

Moving on to the Sugar Contract Scheme, the FAC asserts that on May 28, 2013, Baker and Baker Enterprises executed a promissory note in favor of Frenkel for $250,000 (the "Sugar Note"), with a maturity date of June 21, 2013. (*Id.* ¶ 95.) The Sugar Note was allegedly given in consideration of $250,000 that Frenkel wired to King and Four Kings, which Frenkel refers to as the "Sugar Deposit." (*Id.* ¶ 94.) The note is attached to the FAC. (*Id.* Ex. V.) The FAC alleges that Four Kings is a California incorporated business entity which is King's "alter ego." (*Id.* ¶ 19.) The FAC also alleges that Baker and Baker Enterprises never intended to honor the Sugar Note. (*Id.* ¶ 96.)

According to Frenkel, he agreed to make the Sugar Deposit after Baker "disclaimed any knowledge or responsibility for Webster's actions" and convinced him to invest in a different allegedly lucrative international sugar contract scheme. (*Id.* ¶ 83.) Frenkel alleges that Baker, Baker Enterprises, and New Life Church made up a false sale and purchase contract for sugar (the "Sugar Contract") in which New Life Church was the purported buyer and Baker Enterprises was a beneficiary. (*Id.* ¶ 85.) Frenkel claims that these parties to the Sugar Contract,

as well as Baker Group, knew that the contract was false and used it to fraudulently induce Frenkel to make the Sugar Deposit. (*Id.* ¶ 89.) Frenkel asserts that Baker, Baker Enterprises, Baker Group, New Life Church, King and Four Kings created other false documents regarding the Sugar Contract itself, a Stand-By Letter of Credit that would purportedly be triggered by the Sugar Deposit, and an allegedly large impending deposit into Baker's bank account. (*Id.* ¶¶ 92, 97.) Frenkel asserts that King, Four Kings, Baker, Baker Enterprises, Baker Group, and New Life Church have refused to return the Sugar Deposit, despite multiple written and verbal demands. (*Id.* ¶ 98.)

Frenkel's claims at issue in connection with the alleged SBLC Scheme all arise under Pennsylvania common law and include conversion, fraud, breach of contract, breach of fiduciary duty, unjust enrichment, and money had and received. The claims at issue in connection with the alleged Sugar Contract Scheme also arise under Pennsylvania common law and include conversion, fraud, unjust enrichment, and money had and received.

### B.    Procedural History

Frenkel filed affidavits of service stating that Baker, Baker Enterprises of Polk County, Inc., The Baker Group, New Life Church of Wauchula, Inc., Omar J. Fitzgerald, David B. Webster, Bruce K. Klein, Leo W. King, Four Kings, Inc., Vishnu Kumar, E-Title Services Agency, LLC, and Annette LaBrie were properly served—by certified mail or personal service or both—with the Summons and FAC on various dates between April 4, 2014 and May 29, 2014. LaBrie filed a timely Answer. Baker was served by certified mail on May 12, 2014, and by personal service on May 29, 2014. He filed an Answer on June 20, 2014, twenty-two days after he was personally served. No other Defendant has responded.

At Frenkel's request, the Clerk of Court entered default against each Defendant, except for Defendant LaBrie, on various dates between May 1, 2014 and July 7, 2014. The Clerk of Court entered default judgment against Defendant Baker initially on June 3, 2014, twenty-two days after he was served by certified mail; the Clerk entered a second default against Defendant Baker on June 20, 2014, the same day he filed his Answer and twenty-two days after he was served in person. Frenkel then filed an Application for Default Judgment against all Defendants except LaBrie, pursuant to Federal Rule of Civil Procedure 55(b)(1).  However, because Frenkel seeks attorneys' fees and costs, the Court will construe the Application as a motion for default judgment pursuant to Federal Rule of Civil Procedure 55(b)(2). In support of this motion, Frenkel submitted an additional memorandum of law, which includes an accounting of the attorneys' fees and costs he hopes to recover. No Defendant has responded to Frenkel's motion for default judgment.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 55(b)(2) provides that a district court may enter default judgment against a party when default has been entered by the Clerk of Court. Before entering default judgment, the court must determine that the unchallenged facts set forth in the complaint establish a legitimate cause of action, since a party in default does not admit mere conclusions of law. *Carroll v. Stettler*, Civ. A. No. 10-2262, 2012 WL 3279213, at *2 (E.D. Pa. Aug. 10, 2012); *Bricklayers & Allied Craftworkers Local 1 v. WaterControl Servs., Inc.*, Civ. A. No. 09-3935, 2012 WL 3104437, at *3 (E.D. Pa. July 30, 2012). In addition, the court must consider three factors when deciding whether to grant default judgment under Rule 55(b)(2) when a party has failed to appear: (1) prejudice to the plaintiff if default judgment is denied; (2) whether the

defendant appears to have a litigable defense; and (3) whether the defendant's delay is due to culpable conduct. *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000).

## III.   DISCUSSION

### A.   The FAC Establishes Legitimate Causes of Action

This Court must determine if the FAC properly establishes legal claims, including the jurisdictional prerequisites for those claims. This determination includes an analysis of which substantive law to apply. First, jurisdiction in this Court is proper, as the parties are completely diverse and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Additionally, by executing the two promissory notes at issue, Baker and Baker Enterprises explicitly consented to the jurisdiction of this Court and agreed that the notes would be governed by the laws of the Commonwealth of Pennsylvania. (FAC Exs. H, V.) By executing the Escrow Agreement, Defendant Webster also explicitly consented to the jurisdiction of this Court and agreed that the agreement would be governed by the laws of the Commonwealth of Pennsylvania. (*Id.* Ex. C.) According to affidavits submitted by Plaintiff, service of the Summons and FAC on each of the relevant Defendants was proper. Thus, this Court has jurisdiction over the case and the parties, and it will apply Pennsylvania substantive law.

The Court next turns to the question of whether the factual allegations in each count of the FAC on which Frenkel moves for default judgment constitute legitimate causes of action, "since a party in default does not admit conclusions of law." *Labarbera v. ASTC Labs. Inc.*, 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010). The FAC asserts twenty counts. However, Frenkel moves for default judgment only on the following twelve counts, all under Pennsylvania common law: Count I (Conversion), Count II (Fraud), Count V (Breach of Contract for Escrow Agreement), Count VI (Breach of Contract for SBLC Note), Count VII (Breach of Fiduciary Duty), Count

VIII (Unjust Enrichment), Count IX (Money Had and Received), Count X (Conversion), Count XI (Fraud), Count XIV (Breach of Contract for Sugar Note), Count XV (Unjust Enrichment), and Count XVI (Money Had and Received).

### i. Conversion Claims (Counts I and X)

Pennsylvania common-law conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, without the owner's consent and without lawful justification." *Shonberger v. Oswell*, 530 A.2d 112, 114 (Pa. Super. Ct. 1987) (citing *Stevenson v. Economy Bank of Ambridge*, 197 A.2d 721, 726 (Pa. 1964)). Further, "[c]onversion can result only from an act intended to affect chattel. Specific intent is not required, however, but rather an intent to exercise dominion or control over the goods which is in fact inconsistent with the plaintiff's rights establishes the tort." *Id.* (citations omitted). Chattel includes money. *Id.* An escrow agent may be liable for conversion if he or she delivers the funds subject to the escrow agreement in a manner inconsistent with that agreement. *Samango v. Pileggi*, 526 A.2d 417, 421-22 (Pa. Super. Ct. 1987).

Frenkel has established the elements of a conversion claim against each Defendant named in Count I except for Klein and New Life Church, and against each Defendant named in Count X. Count I asserts that Webster, Klein, Fitzgerald, Baker, Baker Enterprises, Baker Group, New Life Church, Kumar, and E-Title deprived Frenkel of his property right in, use and possession of the Frenkel Funds, without consent and without lawful justification, thereby monetarily damaging Frenkel.

The Escrow Agreement attached to the FAC demonstrates that Webster was legally bound to keep the Frenkel Funds for three days and then return them to Frenkel by March 21, 2013. (FAC Ex. C.) Instead, Webster disbursed the Frenkel Funds without Frenkel's consent,

showing conversion by Webster. The SBLC Note attached to the FAC demonstrates that Baker and Baker Enterprises were legally bound to return the Frenkel Funds to Frenkel by June 28, 2013. (*Id.* Ex. H.) The allegations that they did not do so, without Frenkel's consent, are sufficient to establish conversion by Baker and Baker Enterprises.

Frenkel attaches to the FAC a cashier's check for $65,000 written to E-Title from the account in which Webster placed the Frenkel Funds (and little else), with a memo line referencing Fitzgerald. (*Id.* Ex. N.) This check was deposited into E-Title's bank account and used by Kumar for his personal expenses. These allegations are sufficient to establish intentional dominion and control by E-Title and Kumar over a portion of the Frenkel Funds, inconsistent with Frenkel's rights as the lawful owner.

Frenkel also attaches to the FAC a $114,000 cashier's check, written from the account controlled by Webster, to a car dealer in Maryland. (*Id.* Ex. O.) That check also references Fitzgerald in the memo line, as well as the VIN number for a Range Rover vehicle allegedly purchased from that dealership jointly by Fitzgerald and his wife, LaBrie. Dealership records indicate that Fitzgerald and LaBrie also purchased a second Range Rover at the same time. The FAC also alleges that Fitzgerald and Baker introduced Frenkel to Webster for the fraudulent purpose of carrying out the SBLC Scheme. These allegations are sufficient to establish a conversion claim against Fitzgerald.

The FAC asserts that Klein introduced Frenkel to Baker for the purpose of assisting in the SBLC Scheme to perpetuate a fraud against Frenkel, such that money could be paid to Webster, Fitzgerald, Kumar, and E-Title. However, even though this allegation is unchallenged and therefore accepted as true by the Court, it is not sufficient to establish conversion by Klein, as Klein did not actually deprive Frenkel of the Frenkel Funds.

The FAC asserts that Baker told Frenkel that Baker Group and New Life Church, among others, would benefit from the SBLC and use it to participate in the alleged international sugar contract. In addition, Frenkel attaches to the FAC a document titled "Client Summary" that he alleges Baker gave him to induce him to participate in the SBLC Scheme. (*Id.* Ex. F.) This document is printed on Baker Group/Baker Enterprises letterhead and identifies Baker Enterprises as the "beneficial owner" of a two billion dollar SBLC from HSBC Bank. The FAC asserts that this document is fake and was created in part by Baker Group to induce Frenkel to participate in the SBLC Scheme. These allegations are sufficient to establish Baker Group's intent to exercise control over the Frenkel Funds inconsistent with Frenkel's rights, and therefore conversion. However, Baker's representation that New Life Church would in some way benefit from the fake SBLC, without more direct evidence of New Life Church's involvement in the SBLC Scheme, is insufficient to establish that New Life Church itself deprived Frenkel of the Frenkel Funds. The Court dismisses Count I as to New Life Church.

Count X asserts that King, Four Kings, Baker, Baker Enterprises, Baker Group and New Life Church deprived Frenkel of his property right in, use and possession of the Sugar Deposit, without consent and without lawful justification, thereby monetarily damaging Frenkel. Frenkel asserts that he wired the Sugar Deposit directly to King and Four Kings, and that Baker and Baker Enterprises had a legal obligation to return the Sugar Funds to Frenkel by June 21, 2013. (*Id.* Ex. V.) As in Count I, the allegations that Baker and Baker Enterprises did not do so, without Frenkel's consent, are sufficient to establish conversion by Baker and Baker Enterprises. Frenkel also attached to the FAC what he alleges to be a fictitious purchase and sale contract for sugar, in which New Life Church is identified as the buyer and Baker Enterprises is identified as a beneficiary. (*Id.* Exs. B, R.) Also attached to the FAC is an amendment to a different sugar

contract, indicating that Baker, on behalf of Baker Enterprises and Baker Group, would wire a $300,000 deposit to Four Kings. (*Id.* Ex. T.) Subsequently, Four Kings would receive access to its SBLC (the "Sugar SBLC") and refund the money to Baker Enterprises. The FAC asserts that this deposit included Frenkel's $250,000 Sugar Deposit. The FAC further asserts that Baker Group and New Life Church used the Sugar Amendment to convince Frenkel to make the Sugar Deposit. These assertions are sufficient to establish conversion by the Baker Group and New Life Church. Finally, Frenkel alleges that he had many phone conversations with King directly after June 21, 2013, in which King promised to repay the Sugar Deposit. Frenkel has therefore established a conversion claim against King and Four Kings.

### ii.   Fraud Claims (Counts II and XI)

To establish common-law fraud in Pennsylvania, a plaintiff must allege: "(1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result." *Colaizzi v. Beck*, 895 A.2d 36, 39 (Pa. Super. Ct. 2006) *see also Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 399-400 (E.D. Pa. 2008) (relying on *Colaizzi*). A misrepresentation qualifies as material if, without the misrepresentation, "the transaction would not have been consummated." *Colaizzi*, 895 A.2d at 39.

Frenkel has established claims of fraud against each Defendant named in Count II except for Klein and New Life Church, and against each Defendant named in Count XI. Count II asserts that Webster, Baker, Baker Enterprises, Baker Group, New Life Church, Klein, and Fitzgerald each knowingly made false statements of material facts with the intent to deprive Frenkel of the Frenkel Funds, and that Frenkel reasonably relied on those statements, resulting in monetary damage to Frenkel. The FAC alleges that Baker, Baker Enterprises, and Baker Group produced

fake documents, such as the "Client Summary" and other documents attached to the FAC, which falsely identified Baker Enterprises as the owner of a valuable SBLC, to induce Frenkel to deposit money with Webster. (FAC Exs. D, E, F.) Frenkel asserts that Baker, Webster, and Fitzgerald stated falsely to Frenkel that the Frenkel Funds deposit was necessary to access a lucrative international sugar contract. The FAC alleges that Frenkel was induced to make the Frenkel Funds deposit by these false documents and statements. These assertions are sufficient to allege a claim of fraud against Webster, Baker, Baker Enterprises, Baker Group, and Fitzgerald.

Frenkel also names New Life Church in Count II, and alleges that Baker represented that the SBLC would be used by New Life Church. However, the FAC alleges no specific misrepresentation of a material fact made by New Life Church. Although Frenkel alleges summarily that New Life Church is the alter ego of Baker, he has not pled facts sufficient to show either a failure to observe corporate formalities or that the corporate structure itself was used to create fraud or work injustice, as required for alter ego liability. *Allegheny Energy Supply Co. v. Wolf Run Min. Co.*, 53 A.3d 53, 58-59 (Pa. Super. Ct. 2012); *see also McLaren v. AIG Domestic Claims, Inc.*, 853 F. Supp. 2d 499, 508-09 (E.D. Pa. 2012). The Court therefore dismisses Count II as to New Life Church.

Frenkel also names Klein in Count II, but has not pleaded facts sufficient to support this claim. Frenkel asserts that Klein introduced him to Baker for the purpose of effectuating the SBLC Scheme. However, his FAC alleges no specific misrepresentation of a material fact made by Klein and this Court will not infer one. The Court therefore dismisses Count II as to Klein.

Count XI asserts that Baker, Baker Enterprises, Baker Group, New Life Church, King and Four Kings each knowingly made false statements of material facts with the intent to deprive Frenkel of the Sugar Deposit, and that Frenkel reasonably relied on those statements, resulting in

monetary damage to Frenkel. Specifically, the FAC alleges that Baker, Baker Enterprises, King and Four Kings falsely represented to Frenkel that the Sugar Deposit was necessary in order to complete a one billion dollar sugar contract; that Baker, Baker Enterprises, and New Life Church drafted a false sugar purchase contract (*id.* Ex. R); and that Baker, Baker Enterprises, Baker Group, King, and Four Kings created a fake amendment to another sugar contract (*id.* Ex. T). The FAC alleges that these documents were created to induce Frenkel to make the Sugar Deposit; that the creators of the documents knew they were false; and that Frenkel in fact made the Sugar Deposit in reliance on the representations in these documents.

### iii. *Breach of Contract Claims (Counts V, VI and XIV)*

In Pennsylvania, a plaintiff asserting breach of contract must allege: "(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract, and (3) resultant damages." *McShea v. City of Phila.*, 606 Pa. 88, 97 (2010) (internal citation omitted); *see also Tuno v. NWC Warranty Corp.*, 552 F. App'x 140, 145 (3d Cir. 2014) (relying on *McShea*).

Frenkel easily establishes breach of contract claims against each Defendant named in Counts V, VI, and XIV. Count V asserts that Webster breached his duty to Frenkel to return the Frenkel Funds as required by the Escrow Agreement, thereby monetarily damaging Frenkel. The Escrow Agreement attached to the FAC demonstrates both the existence of the contract and its essential terms. (FAC Ex. C.) Count VI asserts that Baker and Baker Enterprises breached a duty to Frenkel to return the Frenkel Funds as required by the SBLC Note, thereby monetarily damaging Frenkel. The SBLC Note attached to the FAC demonstrates both the existence of the contract and its essential terms. (*Id.* Ex. H.) Count XIV asserts that Baker and Baker Enterprises breached a duty to Frenkel to return the Sugar Deposit as required by the Sugar Note, thereby

monetarily damaging Frenkel. The Sugar Note attached to the FAC demonstrates both the existence of the contract and its essential terms. (*Id.* Ex. V.) The factual allegations contained in Counts V, VI, and XIV each establish a legitimate breach of contract claim under Pennsylvania law.

### iv.    Breach of Fiduciary Duty Claim *(Count VII)*

To claim breach of fiduciary duty in Pennsylvania, a plaintiff must show: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit . . . was a real factor in bring[ing] about plaintiff's injuries." *McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 626 n.18 (E.D. Pa. 1998) (quotation omitted). The fiduciary duty may arise from a contract. *Id.* at 626 n.18, 627.  Further: "The depository (of an escrow or) under an escrow agreement is generally considered to be an agent (or trustee) for both parties—a special agency whose authority must be strictly construed, and who is bound by the terms of the escrow agreement." *Paul v. Kennedy*, 102 A.2d 158, 159 (Pa. 1954). Thus, an escrow depository has a fiduciary duty to the depositor of the escrow. *In re 222 Liberty Assocs.*, 110 B.R. 196, 201 (E.D. Pa. Bankr. 1990).

Count VII alleges that Webster breached his fiduciary duty to Frenkel by intentionally failing to act in good faith and solely for the benefit of Frenkel by refusing to return the Frenkel Funds as required by the Escrow Agreement, thereby monetarily injuring Frenkel. The Escrow Agreement, attached to the FAC, demonstrates Webster's duty to Frenkel. (FAC Ex. C.) Frenkel alleges that Webster intentionally breached that duty by dispersing the Frenkel Funds to other people, contrary to Frenkel's desires. Frenkel asserts he was injured by Webster's conduct in that

he still has not recovered the Frenkel Funds. The factual allegations contained in Count VII establish a breach of fiduciary duty claim under Pennsylvania law.

<strong><em>v.     Unjust Enrichment Claims (Counts VIII and XV)</em></strong>

Unjust enrichment in Pennsylvania requires the following elements: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. Ct. 1999) (quotation omitted). Although "direct conferral of a benefit is not required, the relationship between the plaintiff and the defendant may not be too remote." *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 443-44 (E.D. Pa. 2010). The remedy for unjust enrichment is for the defendant to pay the plaintiff the full value of the benefit given. *Mitchell*, 729 A.2d at 1203.

Frenkel has established claims of unjust enrichment against each Defendant named in Count VIII except for New Life Church and Klein, and each Defendant named in Count XV. Count VIII alleges that Webster, Fitzgerald, Baker, Baker Enterprises, Baker Group, New Life Church, Kumar, and E-Title, under fraudulent and inequitable circumstances, wrongfully retained money paid by Frenkel. The FAC asserts that Frenkel transferred the Frenkel Funds directly to Webster, which Webster then disbursed to Fitzgerald, Kumar, and E-Title. The FAC also asserts that these transfers were actively solicited by Baker, Baker Enterprises, and Baker Group, and therefore infers that these Defendants also benefitted from the transfers. The FAC asserts that Frenkel was never compensated for the Frenkel Funds. These allegations establish an unjust enrichment claim under Pennsylvania law as to Webster, Fitzgerald, Baker, Baker Enterprises, Baker Group, Kumar, and E-Title.

15

As with Counts I and II, Frenkel does not allege sufficient facts to make claims against New Life Church or Klein in Count VIII. As to New Life Church, the FAC only alleges that Baker represented to Frenkel that New Life Church would use the SBLC. However, as discussed above, Frenkel has not made allegations sufficient for alter ego liability between Baker and New Life Church, nor has he alleged that New Life Church actually benefitted from the Frenkel Funds. The Court therefore dismisses Count VIII as to New Life Church.

As to Klein, the FAC only alleges that he introduced Frenkel to Baker in order to assist in the fraud, but not that he received any benefit from the Frenkel Funds. The Court finds this connection too remote to qualify for unjust enrichment and therefore dismisses Count VIII as to Klein. *See Sheet Metal Workers*, 737 F. Supp. 2d at 443-44.

Count XV alleges that King, Four Kings, Baker, Baker Enterprises, Baker Group, and New Life Church, under fraudulent and inequitable circumstances, wrongfully retained money paid by Frenkel. The FAC asserts that Frenkel transferred the Sugar Deposit to King and Four Kings directly, that Baker and Baker Enterprises secured the deposit with the false Sugar Note, and that other false statements and documents, attached to the FAC, indicated that Baker Group and New Life Church would also benefit from the Sugar Scheme. (FAC Exs. B, R, T.) The FAC asserts that Frenkel was never compensated for the Sugar Deposit. These allegations establish an unjust enrichment claim under Pennsylvania law.

### vi.   *Money Had and Received Claims (Counts IX and XVI)*

The common-law claim of "money had and received" allows a plaintiff to recover money paid to a defendant if "(1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient." *Springfield Twp. v. Mellon PSFS Bank*, 889 A.2d 1184, 1186 n.2 (Pa. 2005) (quotation omitted); *see also Cohen v. Chicago Title Ins. Co.*, 242 F.R.D.

295, 297 (E.D. Pa. 2007) (relying on *Springfield Twp.*). It does not matter whether a defendant receives the money, or other property which he or she is not entitled to keep, from someone other than the plaintiff. *Hughey v. Robert Beech Assocs.*, 378 A.2d 425, 427 (Pa. Super. Ct. 1977).

Frenkel has established claims of money had and received against each Defendant named in Count IX except for New Life Church and Klein and against each Defendant named in Count XVI. Count IX alleges that Webster, Fitzgerald, Baker, Baker Enterprises, Baker Group, New Life Church, Klein, Kumar, and E-Title received the Frenkel Funds from Frenkel under false pretenses, which were known to these Defendants at the time. The FAC asserts that Frenkel deposited the Frenkel Funds with Webster at the behest of Baker and Baker Enterprises, and that Frenkel received in return the SBLC Note from Baker and Baker Enterprises and an Escrow Agreement from Webster and Baker Enterprises. The FAC also asserts that the SBLC Note and the Escrow Agreement have not been honored and that Defendants never had any intention of honoring them. The FAC states that Frenkel received false documents made by Baker, Baker Enterprises, and Baker Group indicating that the Frenkel Funds would be used for the benefit of these Defendants. The FAC further asserts that Webster disbursed the Frenkel Funds to Fitzgerald and to E-Title, which disbursed them to Kumar, all without Frenkel's knowledge or consent. These allegations are sufficient to establish claims for money had and received against Webster, Fitzgerald, Baker, Baker Enterprises, Baker Group, Kumar, and E-Title. The FAC does not allege that either New Life Church or Klein ever received any of the Frenkel Funds or any specific benefit from the Frenkel Funds. The Court therefore dismisses Count IX as to New Life Church and Klein.

Count XVI alleges that Baker, Baker Enterprises, Baker Group, New Life Church, King, and Four Kings received the Sugar Deposit from Frenkel under false pretenses, which were

known to these Defendants at the time. The FAC asserts that Baker, Baker Enterprises, Baker Group, and New Life Church represented to Frenkel that they would use the Sugar Deposit in furtherance of a major business deal, for proof of which they provided a fake contract. The FAC claims that Frenkel wired the Sugar Deposit to King and Four Kings as a result of these representations, and that Frenkel received in return a promissory note from Baker and Baker Enterprises. The FAC further asserts that this promissory note has not been honored, that Defendants never had any intention of honoring that note, and that Frenkel has received no other compensation for the Sugar Deposit. These allegations are sufficient to establish claims for money had and received against Baker, Baker Enterprises, Baker Group, New Life Church, King, and Four Kings.

##### B.    Default Judgment Is Proper as to All Non-Answering Defendants

Having determined that Frenkel has established a number of his claims, the Court must consider the *Chamberlain* factors to decide whether default judgment is proper. The first factor is whether Frenkel will be prejudiced if default judgment is denied. *See Chamberlain*, 210 F.3d at 164. "A plaintiff is prejudiced if denying the default judgment would result in the loss of evidence or impair the plaintiff's ability to effectively pursue his or her claim." *Carroll*, 2012 WL 3279213, at *2. Prejudice is particularly likely where the defendants do not answer at all, and the delay threatens to stretch on indefinitely. *See Grove v. Rizzi 1857 S.P.A.*, Civ. A. No. 04-2053, 2013 WL 943283, at *2 (E.D. Pa. Mar. 12, 2013); *Carroll*, 2012 WL 3279213, at *3. Frenkel filed this lawsuit to recover money lent but not repaid. He asserts that repeated demands for the money have not resulted in payment, and it is unclear how Frenkel would recover his money if not through this lawsuit. Thus, Frenkel would be prejudiced if the default judgment were not granted in his properly pled claims against the non-answering Defendants. The same

reasoning does not hold for Baker, who filed a pro se Answer to the FAC, albeit slightly late. In addition, an attorney recently entered an appearance on behalf of Baker, indicating that a more robust adversarial process may be possible as to Frenkel's claims against Baker. Although Frenkel contests the adequacy of Baker's Answer, the Court finds that Frenkel would not be unduly prejudiced by continuing to litigate his claims against Baker at this nascent stage.

The second factor that the Court must consider is whether Defendants have any meritorious defenses. *Chamberlain*, 210 F.3d at 164. "Courts often weigh this factor in favor of granting default judgment where a party has failed to answer claims against it." *Grove*, 2013 WL 943283, at *3; *see also E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 553 (E.D. Pa. 2009). In this case, only LaBrie and Baker answered the FAC. Although it is hard to tell exactly which allegations Baker has admitted, due to some creative numbering in his pro se Answer, he seems to have denied or disclaimed knowledge of most of the FAC. Baker also now has an attorney, who will presumably try to clarify this state of affairs. The Court will therefore not weigh this factor against Baker at this stage. As to the non-answering Defendants, there is no way for the Court to know whether they have any viable defenses, so the Court will weigh this factor against the absent Defendants.

The third factor requires the Court to consider the culpability of Defendants' conduct. *See Chamberlain*, 210 F.3d at 164. The Third Circuit has held that "willfulness" or "bad faith," but not negligence, is culpable. *Hritz v. Woma Corp.*, 732 F.2d 1178, 1183 (3d Cir. 1984). Bad faith may be presumed if a defendant offers no reason for its failure to engage in the litigation process. *See E. Elec. Corp. of N.J.*, 657 F. Supp. 2d at 554. "Defendants' failure to respond permits the Court to draw an inference of culpability on their part." *Fed. Ins. Co. v. Secure Cargo Corp.*, Civ. A. No. 12-851, 2013 WL 1222653, at *3 (D.N.J. Mar. 25, 2013). This Court will draw such

an inference from Defendants' absence. Because the Court infers that the non-answering Defendants engaged in culpable conduct by failing to respond to the FAC, this factor weighs in favor of granting Plaintiff default judgment as to the non-answering Defendants. Even Baker, despite his Answer, has not offered a reason for his tardiness. This factor therefore weighs against Baker, too, although to a lesser extent than the other Defendants.

Based on its evaluation of the *Chamberlain* factors, the Court will exercise its discretion to enter default judgment for Plaintiff as to the non-answering Defendants, but not as to Baker. The Court finds that default judgment is necessary so that Plaintiff may recover what he is owed from the non-answering Defendants.

### C.      Damages

"Where a court enters a default judgment, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 n.6 (3d Cir. 2005). The court may calculate damages by conducting a hearing or by receiving evidence or detailed affidavits from the claimant. *E. Elec. Corp. of N.J.*, 657 F. Supp. 2d at 552; *Amresco Fin. I L.P. v. Storti*, Civ. A. No. 99-2613, 2000 WL 284203, at *2 (E.D. Pa. Mar. 13, 2000). However, where a plaintiff seeks a sum certain, no extrinsic evidence as to the amount of damages is required. *See KPS & Assocs., Inc. v. Designs By FMC, Inc.*, 318 F.3d 1, 19-20 (1st Cir. 2003). "The term 'sum certain' in this context contemplates a situation in which, once liability has been established, there can be no dispute as to the amount due, as in actions on money judgments and negotiable instruments." *Id.* (internal citation omitted). Because Plaintiff seeks only the principal amounts listed in the promissory notes and Escrow Agreement, plus interest calculated at the default rates contained in the promissory notes, this is a sum certain case and the Court may award damages for the amount specified by Plaintiff.

Frenkel asserts that he is entitled to repayment of the principal amounts paid by him and promised by the promissory notes, plus interest. Having reviewed the terms of these notes, the Court agrees. The SBLC Note's principal was $250,000, and that note contains a provision setting an interest rate of 15% per year, from the date of the note's execution, to be imposed in case of default. (FAC Ex. H.) The interest due as of this date is $61,541.10. The interest will continue to accrue at the rate of $102.74 per diem. Baker Enterprises is solely liable for the interest, and jointly and severally liable for the $250,000 principal amount—the Frenkel Funds— along with those defaulted Defendants in Counts I, II, V, VII, VIII, and IX, namely Webster, Baker Group, New Life Church, Fitzgerald, Klein, Kumar, and E-Title.  Frenkel does not seek any interest on the Frenkel Funds from these Defendants.

The Sugar Note's principal was $250,000. (*Id.* Ex. V.) That note contains an interest rate of 12% per year. The interest due as of this date is $43,150.68. The interest will continue to accrue at the rate of $82.19 per diem. Baker Enterprises is solely liable for the interest, and jointly and severally liable for the $250,000 principal amount—the Sugar Deposit—along with those defaulted Defendants in Counts X, XI, XIV, XV, and XVI, namely Baker Group, New Life Church, King, and Four Kings.  Frenkel does not seek any interest on the Sugar Deposit from these Defendants.

### D.    Attorneys' Fees

The SBLC Note and the Sugar Note each contain an attorneys' fees provision. The provision, which is identical in both notes, states: "Borrower shall pay all costs of collection incurred by Lender, including without limitation, the reasonable attorney's fees and disbursements of Lender's legal representative . . . ." (FAC Exs. H, V.) These costs and fees were to be payable on demand when the principal was repaid. (*Id.*) Thus, Frenkel is clearly

entitled to the portion of reasonable attorneys' fees and costs associated with the promissory notes in this action. Frenkel has submitted an accounting of these fees and costs, and the Court must decide whether the attorneys' fees he seeks are reasonable.

Frenkel calculated his total attorneys' fees for this action at $149,695, and his total litigation costs at $1,205.06. He now seeks a total of $22,454.24 in attorneys' fees and $180.76 in litigation costs.[3]

When assessing whether attorneys' fees are reasonable, courts begin by determining the number of hours reasonably spent on the litigation and a reasonable hourly rate for the work completed. *See McKenna v. City of Phila.*, 582 F.3d 447, 455 (3d Cir. 2009). In this analysis, courts exclude hours that are "excessive, redundant, or otherwise unnecessary." *Id.* A court should also "reduce the hours claimed by the number of hours spent litigating claims on which the party did not succeed, that were distinct from the claims on which the party did succeed, and for which the fee petition inadequately documents the hours claimed." *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 178 (3d Cir. 2001).

The reasonable hourly rate is calculated "according to the prevailing market rates in the community." *Smith v. Phila. Hous. Auth.*, 107 F.3d 223, 225 (3d Cir. 1997). The party seeking attorneys' fees bears the burden of producing sufficient evidence of what constitutes a reasonable market rate, which is established "with reference to the community billing rate charged by attorneys of equivalent skill and experience performing work of similar complexity." *Carey v. City of Wilkes-Barre*, 496 F. App'x 234, 236 (3d Cir. 2012). However, if a party does not submit evidence to establish a reasonable hourly rate, "the district court must exercise its discretion in

---

[3] He arrives at this number by reasoning that Baker and Baker Enterprises should be jointly responsible for the fees on the notes because they both signed each of the notes. As there were a total of thirteen defendants named in the FAC, Frenkel estimates that Baker and Baker Enterprises should be liable for two thirteenths, or approximately fifteen percent, of the total attorneys' fees and costs. Frenkel asserts that fees and costs should be split evenly between the two promissory notes.

fixing a reasonable hourly rate." *See Washington v. Phila. Cnty. Court of Common Pleas*, 89 F.3d 1031, 1036 (3d Cir. 1996); *see also L.J. ex rel. V.J. v. Audubon Bd. of Educ.*, 373 F. App'x 294, 297 (3d Cir. 2010).  After these considerations, a district court may consider other factors, such as the "results obtained," to adjust the award of fees upward or downward. *Hensley*, 461 U.S. at 434.

Frenkel has submitted a summary accounting of his fees and costs in this matter, revealing the following key details. Frenkel asserts that his attorneys and their staff spent a total of 657.2 billable hours on this matter. Though many of Frenkel's claims are ending at an early stage, this case is factually complex, required significant investigation, and involved many Defendants, including one—Daniel Webster—who had apparently stolen another Daniel Webster's identity, resulting in some initial confusion and litigation over the identity of the correct Defendant. Reviewing the docket in this matter in conjunction with Frenkel's accounting, this Court concludes that the time spent on this litigation was reasonable. According to Frenkel's accounting, attorney rates seem to range from about $210 per hour to about $315 per hour. Paralegal, or other presumably non-attorney, time was billed at $95 per hour. Though Frenkel has not submitted evidence on reasonable hourly rates in the community, this Court will exercise its discretion, based on its familiarity with community rates and the level of lawyering in this action, to conclude that these rates are reasonable. *See Washington*, 89 F.3d at 1036. Thus, the submitted total attorneys' fees of $149,695 are reasonable. The submitted total litigation costs of $1,205.09, which mainly consists of filing fees and service fees, is also reasonable.

Frenkel has requested his attorneys' fees and costs be shared on a pro rata basis per Defendant. Although Frenkel requested fees and costs for both Baker and Baker Enterprises, the Court has not granted default judgment against Baker. Thus, Frenkel is entitled to one-thirteenth

of his total fees and costs from Baker Enterprises, which amounts to $11,515 in attorneys' fees and $92.70 in costs.[4]

## IV.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Frenkel's Application for Default Judgment. In addition to damages, the Court awards $11,515 in attorneys' fees and $92.70 in litigation costs. An Order consistent with this Memorandum will be docketed separately.

---

[4] The discrepancy between these numbers and half of what Frenkel requested results from Frenkel rounding two-thirteenths to fifteen percent, while the Court has used one-thirteenth exactly.